ROSELLA FRIDERES, Administratrix, Appellee, v. FRANK O. LOWDEN et al., Trustees, Appellants.

No. 46636.

 

FEBRUARY 6, 1945.

J. G. Gamble and R. L. Read, both of Des Moines, and Quarton & Miller, of Algona, for appellants.

Hutchison & Hutchison and Linnan & Lynch, all of Algona, for appellee.

GARFIELD, J.—Defendants are trustees of the Rock Island Railroad. The collision occurred at a country grade crossing about 7:30 a. m., on April 28, 1942. The automobile, a 1936 Chevrolet four-door sedan, was proceeding east on a graveled highway. The railroad runs northwest and southeast. The train was a passenger train from the southeast, propelled by a Diesel motor to which were attached three other cars. The automobile collided with the fore part or middle of the second of the four cars. Faber drove the automobile. Decedent sat in the front seat at the driver's right. Two ladies sat in the rear seat. Frideres and one of the ladies were killed. This action was brought by Frideres' administratrix on behalf of his estate. Defendants have appealed from verdict and judgment against them.

I. Defendants first contend that as a matter of law the sole proximate cause of the collision was the negligence of the driver, Faber, and that no negligence of defendants had any causal connection therewith. The court instructed the jury that Faber was negligent and his negligence was a proximate cause of the collision but left it to the jury to say whether the trainmen were also negligent in not giving the required signals of the train's approach and whether such negligence was also a proximate cause of the collision. We think the question of proximate cause was for the jury.

Defendants' answer alleged as an affirmative defense that decedent's death was proximately caused by the negligence of

Faber in driving his automobile into the side of the train. While, of course, plaintiff had the burden to prove direct causal connection between defendants' negligence and the happening of the collision, the burden to prove this affirmative defense by a preponderance of the evidence rested upon defendants. Johnson v. McVicker, 216 Iowa 654, 658, 247 N. W. 488; Reddick v. Grand Union Tea Co., 230 Iowa 108, 115, 296 N. W. 800, 803; Maland v. Tesdall, 232 Iowa 959, 963, 5 N. W. 2d 327, 329. In effect, the jury was so instructed. Since defendants have not complained of this instruction (13a), it is the law of the case. Commercial Credit Co. v. Hazel, 214 Iowa 213, 215, 242 N. W. 47; Loran v. City of Des Moines, 205 Iowa 1349, 1350, 219 N. W. 418; Lange .v. Bedell, 203 Iowa 1194, 1202, 212 N. W. 354. In the absence of an admission by the adverse party,' it is not often that a party having the burden of proof upon such an issue establishes it as a matter of law. Maland v. Tesdall, supra. See, also, Kellogg v. Rhodes, 231 Iowa 1340, 1342, 4 N. W. 2d 412, 413.

In considering this and the other assignments of error we will view the evidence in the light most favorable to plaintiff. Decedent was a nephew of Mrs. Faber, who died on April 26, 1942, and a cousin of George Faber, driver of the car and son of the lady who died. Frideres sat up in the Faber home all of the night before the collision. George Faber slept only about four hours that night. Mrs. Faber was to be buried on the morning the collision occurred. In the early morning of April 28th George Faber started for West Bend, about four miles west of the Faber farm, to buy groceries and get the two ladies who later became passengers in his automobile. The ladies were to help in the Faber home with the extra work due to the funeral.

Frideres accompanied his cousin on the trip to West Bend because he was drowsy but did not want to go to sleep. Frideres was a farmer who had worked in the field all the preceding day, which was windy, warm, and dusty. The railroad crossing was about a mile west of the Faber farm. Faber and Frideres crossed it going into West Bend. Faber was very familiar with the crossing but Frideres had never seen it before. After getting the groceries and the two ladies in West Bend, they started back to the farm, driving east at the time of collision.

A blinding sun was low in the east or somewhat south of east. Faber pulled down the sunshade on his side of the car. There was no sunshade on the right side where Frideres sat. One of the ladies wore dark glasses. The windows of the Chevrolet were closed except that the small ventilator window in the left front door was open. While the ladies exchanged a few words, there was no other talking. Faber appeared to be giving strict attention to his driving.

There were four trees, spaced about evenly, on the south side of the highway west of the railroad. The trunk of the east tree, nearest the railroad, was about two hundred forty feet west of the track. The trunk of the west tree was about ninety feet farther west. When Faber was about even with this west tree (three hundred thirty feet west of the railroad) he looked to the left or north up the track. Since the railroad ran northwest it was necessary for him ''to turn clear around'' to make this observation. Faber then looked down the road to the east. When the front of the automobile was about eighty-five feet west of the crossing Faber looked to his right along the track and discovered the approaching train about one hundred twenty-six feet southeast of the intersection.

The train was traveling fifty-five to sixty miles per hour. The engineer estimated the speed at fifty miles per hour. The train was fifty minutes behind schedule. The Chevrolet was traveling forty to forty-five miles per hour. When Faber saw the train he slammed on his brakes as quickly and as hard as he possibly could. The passengers were thrown forward and to the top of the car. Although the brakes functioned perfectly, Faber was unable to stop before his automobile struck the fore part of the second car of the train. When the Chevrolet came in contact with the train ''it was not going very fast'' but ''had pretty well stopped.''

While the view of the railroad from the road was not obstructed for the two hundred forty feet between the four trees and the crossing, the sun and Traub's grove made it more difficult to see the train. This large grove was on the east side of the railroad, southeast of the crossing, and formed a dark background for a train.

Defendants argue that, even though the warning signals of the train's approach were not given, Faber's negligence was a superseding, intervening cause which in itself produced the actionable result and rendered the alleged negligence of the railroad a remote, rather than a proximate, cause. In effect, it is contended that the failure of warning signals is a mere circumstance rather than a cause of the collision. The authorities cited by defendants do not sustain the contention, as applied to this record.

In Wright v. Chicago, R. I. & P. R. Co., 222 Iowa 583, 268 N. W. 915, cited by defendants, we held that failure of warning signals was not a proximate cause and, in effect, was immaterial, where the driver of the automobile had full knowledge of the approach of the train in ample time to have avoided the collision. Such knowledge of the driver in the Wright case not only was shown but was admitted by both parties. That decision follows Frush v. Waterloo, C. F. & N. R. Co., 185 Iowa 156, 169 N. W. 360, where it appeared by the plaintiff's evidence that the automobile driver not only saw the train in time to stop but did in fact stop before he reached the railroad; the collision was caused by the driver's starting his car again before the train had cleared the crossing.

The cited decisions are not applicable here. It does not appear as a matter of law that Faber knew of the train's approach in time to have avoided the collision. The jury could have found that from the time he saw the train he exercised reasonable care in an attempt to avoid the collision. Faber's negligence primarily was in not sooner discovering the presence of the train. The two principal witnesses for defendants were the engineer of the train and Ludwig, a trucker who saw the collision. The engineer testified, ''I knew that he wasn't going to get stopped * * * At the time the engine got about 150 ft. from the crossing I decided that he wasn't going to get stopped.'' Ludwig testified, ''as the train began nearing the crossing I kind of foreseen the accident.'' This testimony is consistent with Faber's claim that he could not have avoided the collision after he discovered the train.

Of course, it cannot be demonstrated to a certainty that failure to give the warning signals was a direct cause of the

collision. Possibly Faber might not have heard nor heeded the signals if they had been given. But absolute certainty of proof is not required. Even though there may be some degree of doubt that the signals, if given, would have prevented the collision, it does not follow that the question of proximate cause was not one for the jury. Smith v. Chicago, B. & Q. R. Co., 227 Iowa 1404, 1413, 291 N. W. 417, 422; Swaim v. Chicago, R. I. & P. Ry. Co., 187 Iowa 466, 471, 170 N. W. 296, 174 N. W. 384; Kuehl v. Chicago, M. & St. P. Ry. Co., 126 Iowa 638, 640, 102 N. W. 512; 2 Restatement of the Law, Torts, 1161, 1163, section 432.

We think the jury could properly have found that if the required signals had been given Faber would have discovered the approach of the train in time to have avoided the collision and that decedent would not have been killed. We cannot say as a matter of law that the required signals would have proved unavailing or that the collision would have occurred even though the signals had been given. That the issue of proximate cause was for the jury, see Reysack v. Joyce, 232 Iowa 415, 419, 3 N. W. 2d 535, 537; Saeugling v. Scandrett, 230 Iowa 153, 296 N. W. 787; 2 Restatement of the Law, Torts, 1161, 1163, section 432.

II. Defendants challenge the sufficiency of the evidence that the required signals were not given. It is contended the testimony that signals were not heard is without probative value because unaccompanied by proof that the witnesses were in a position or mental attitude to have heard such signals if given. Section 8018, Code, 1939, provides in substance that a whistle shall be twice sharply sounded at least sixty rods before a road crossing is reached, and after the sounding of the whistle a bell shall be rung continuously until the crossing is passed. We think there is substantial evidence that such signals were not given.

Faber testified that he knew he was coming to a railroad crossing and was listening for a whistle and bell but heard neither. Mrs. Bauman, the surviving passenger, testified she knew the railroad crossed the highway at some place; she heard no whistle or bell until after the collision; she was rendered unconscious by the collision; when she "came to" the whistle

was blowing and the bell was ringing "real loud"; while she was still sitting on the ground, dazed by the accident, she said, "If the train had whistled like you are whistling now we would have heard you." There is evidence that neither of the deceased passengers heard any signal. Neither gave any indication of knowledge of the train's approach until after the brakes were applied. As stated, the left ventilator window was open. There was no visiting. The car had recently been overhauled and made no unusual noise. There was nothing to prevent the occupants of the car from hearing the signals had they been given.

Traub lived about one hundred ten steps east of the railroad and roughly a quarter of a mile south of the crossing. He testified:

"I was in the house eating breakfast at about seven-thirty the morning of the accident. I can hear the sound of the horn on the north-bound passenger train as it comes by my farm when I am in the house. I didn't hear the whistle of the train that morning until after the accident. Then I heard the whistling and we mentioned it. I said, 'Well, somebody's stock is out in the right-of-way.'. Up to that time I heard nothing. The sound of the whistle or horn came from the direction of the crossing. * * * The first I heard the whistle was when the stock alarm was sounded; a kind of special or sharp quick blast, one after another."

The engineer testified that he pulled the cord to sound the whistle or horn at the whistling post, which he said was one thousand feet southeast of the crossing (actually it was about fifteen hundred feet); when he was six hundred feet from the crossing he turned on the bell, and at one hundred fifty to two hundred feet from the crossing he started sounding the "stock alarm," a succession of short blasts of the whistle or horn; he heard none of the signals, because of the noise of the motor, until after the train was brought to a stop and he put his head out the window, but the signaling equipment was in working order.

The conductor testified that the only time he paid any attention to the whistle was when the stock alarm was sounded

about the time the brakes were applied. The engineer said he applied the brakes when the train was one hundred to one hundred fifty feet from the crossing. A farmer who lived a half mile north and a little west of the crossing said he heard the stock alarm but no bell; he did not know where the train was when the alarm was sounded; the train stopped about seventeen hundred feet northwest of the crossing. Another farmer, a mile north and forty rods east of the crossing, said he heard a whistle but did not know whether it was from the train or what it was. Ludwig, in his truck, was following Faber. He heard no bell but said he did hear a whistle before the collision. His testimony, however, is inconsistent in different respects.

We cannot say there was a failure to prove that the signals as required by law were not given. No witness testified he heard any bell before the collision and several (some of whom were offered by defendants) who were in a position and mental attitude to hear said they heard none. There is a conflict as to whether the whistle was sounded, but there is ample evidence that there was no whistle, at least until the "stock alarm" was sounded. Even under the testimony of the conductor and engineer, the jury could have found the train was then within one hundred feet of the crossing. Testimony that a whistle was heard must be considered in connection with the admitted fact that the whistle was sounded after the collision.

Among the numerous cases in support of our conclusion are: Finley v. Lowden, 224 Iowa 999, 1001, 1002, 277 N. W. 487; Hines v. Chicago, M. & St. P. Ry. Co., 196 Iowa 109, 112, 113, 194 N. W. 188; Brose v. Chicago G. W. R. Co., 185 Iowa 867, 871, 171 N. W. 149; Burnett v. Chicago, M. & St. P. Ry. Co., 172 Iowa 704, 706, 707, 154 N. W. 919; Selensky v. Chicago G. W. Ry. Co., 120 Iowa 113, 115, 94 N. W. 272.

III. We think the issue of decedent's freedom from contributory negligence was also for the jury. It may be conceded that if Faber had been injured his negligence would have barred recovery by him. But this case for the death of a guest is controlled by different considerations. Finley v. Lowden, supra; Miller v. Union Pac. R. Co., 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285, 288. Decedent had no right of control over the auto-

mobile. Faber's negligence, therefore, is not to be imputed to decedent. Churchill v. Briggs, 225 Iowa 1187, 1190, 1191, 282 N. W. 280, and cases cited; Carpenter v. Wolfe, 223 Iowa 417, 426, 427, 273 N. W. 169, and cases cited; Crowley v. Chicago, B. & Q. R. Co., 204 Iowa 1385, 1387, 213 N. W. 403, 53 A. L. R. 964; Miller v. Union Pac. R. Co., supra. The question is whether Frideres, rather than Faber, exercised ordinary care for his own safety.

It is probably true to a limited extent that decedent entrusted his safety as well as the direction of the automobile to Faber. But this was not necessarily negligence on his part. Finley v. Lowden, supra, 224 Iowa 999, 1003, 277 N. W. 487. A passenger in an automobile is not under an absolute duty to see an impending danger in time to interfere and prevent it. Within reasonable limits he may rely upon the skill and judgment of the driver. A passenger is not required to exercise the same degree of vigilance in looking and listening as is required of the driver. Jensvold v. Chicago G. W. R. Co., 234 Iowa 627, 12 N. W. 2d 293, 295, and cases cited; Finley v. Lowden, supra, 224 Iowa 999, 1004, 1005, 277 N. W. 487, and authorities cited. See, also, Carpenter v. Wolfe, 223 Iowa 417, 424, 273 N. W. 169.

On this issue it is proper to consider that Frideres worked in the field all the preceding day and sat up all night with the dead body of his aunt; he appeared to be tired out; he was not familiar with the locality and had never seen this railroad crossing before the trip into West Bend, if, indeed, he observed it at that time; there is no indication that he knew they were approaching the crossing until the brakes were applied; the sun was shining in his eyes and there was no sunshade on his side of the windshield; Faber, however, was protected by a sunshade; Frideres knew that Faber was thoroughly familiar with the highway and was a competent and experienced driver; also that Faber had slept four hours the night before and presumably the two ladies had gotten a full night's sleep; Faber appeared to be paying strict attention to his driving and the car was moving at moderate speed; there was no apparent cause for alarm; decedent sat facing Faber, away from the direction from which

the train came, with his left arm over the back of the front seat; he appeared to be relaxing and resting.

On the question of plaintiff's freedom from contributory negligence, the evidence that the required signals were not given by the trainmen is also properly to be considered. Carpenter v. Wolfe, supra, 223 Iowa 417, 424, 273 N. W. 169; Johnson v. Omaha & C. B. St. Ry. Co., 194 Iowa 1230, 1234, 190 N. W. 977, and cases cited; Butterfield v. Chicago, R. I. & P. Ry. Co., 193 Iowa 323, 328, 185 N. W. 151, and cases cited; 3 Blashfield Cyclopedia of Automobile Law & Practice, Perm. Ed., 155, 156, section 1757. The occupants of the automobile had a right to assume, until they had knowledge or notice to the contrary, that the required signals would be given. Saeugling v. Scandrett, supra, 230 Iowa 153, 156, 296 N. W. 787, 788; Nederhiser v. Chicago, R. I. & P. Ry. Co., 202 Iowa 285, 290, 208 N. W. 856; Barrett v. Chicago, M. & St. P. Ry. Co., 190 Iowa 509, 515, 175 N. W. 950, 180 N. W. 670, and cases cited; 44 Am. Jur. 718, section 480.

In support of our conclusion that contributory negligence was a question for the jury, see Finley v. Lowden, supra, 224 Iowa 999, 1003–1005, 277 N. W. 487, and authorities there cited; Johnson v. Omaha & C. B. St. Ry. Co., supra, 194 Iowa 1230, 190 N. W. 977; Bradley v. Interurban Ry. Co., 191 Iowa 1351, 1354, 183 N. W. 493. See, also, Jensvold v. Chicago G. W. R. Co., supra, 234 Iowa 627, 631, 12 N. W. 2d 293, 295; Teufel v. Kaufmann, 233 Iowa 443, 447, 6 N. W. 2d 850, 852, 853; Muirhead v. Challis, 213 Iowa 1108, 1115, 240 N. W. 912.

█ IV. Finally, it is contended the amount of the verdict is so excessive as to indicate passion and prejudice on the part of the jury. The verdict and judgment were for $7,840.82. However, plaintiff had received $2,000 in return for a covenant not to sue George Faber and the estate of Mrs. Faber as a result of the collision. The jury was instructed that defendants were entitled to a credit of this $2,000, with interest from date of payment, upon any amount it should allow plaintiff. See, on this question, Greiner v. Hicks, 231 Iowa 141, 146, 147, 300 N. W. 727, 730, 731. Evidently the jury found the pecuniary loss to the estate was substantially $10,000. Presumably the verdict would have been for that amount if the payment by the Fabers

had not been made. We are not prepared to hold such amount excessive.

Decedent was twenty-seven years old, married, and the father of three children. He had been farming a rented quarter section for two or three years without hired help except for once or twice in the busy season. He earned between $2,000 and $3,000 a year after paying his rent. Before farming for himself he had worked as a farm hand. He had a tractor, a set of farm machinery, a few head of livestock, and household goods. His father gave him the tractor and disc but he acquired the other property himself during the two or three years he had been farming for himself. He was in perfect health. His expectancy was 37.43 years. He was a good worker and farmer, a good husband and father. He saved his money and was trying to get ahead. There is nothing in the record to indicate passion or prejudice on the part of the jury. It is not contended the jury was incorrectly instructed on the measure of recovery. Defendants waived argument to the jury.

That the size of the verdict does not justify interference on our part, see Engle v. Nelson, 220 Iowa 771, 784, 785, 263 N. W. 505, and cases there cited; Scott v. Hinman, 216 Iowa 1126, 1132, 1133, 249 N. W. 249.—Affirmed.

HALE, C. J., and OLIVER, BLISS, SMITH, and MULRONEY, JJ., concur.

MANTZ, J., takes no part.